**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

Michael Zucchero,

          *Plaintiff,*

      v.

Bizango; Selena Romano; the OKX
Off-Ramp Defendant; and the
Binance Off-Ramp Defendant,

          *Defendants.*

Case No. 1:26-cv-00205

**Complaint**

Plaintiff Michael Zucchero hereby sues Bizango, Selena Romano, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant (collectively, the "Defendants"). In support, he alleges as follows.

### I.    Preliminary Statement

1.    Our country is in the midst of a crypto-fraud crisis driven increasingly by fraudulent remote-work and task-based employment schemes. Foreign criminal organizations have stolen hundreds of millions of dollars from hardworking Americans in what are known as "task scams" or "gamified job scams." They continue to do so at an accelerating pace. These schemes are not isolated incidents. They are industrialized, transnational fraud operations that recruit victims through unsolicited messages, trap

them with carefully engineered cycles of small payouts and escalating deposit demands, and defraud victims while evading detection and recovery.

2.     Although the particulars vary from case to case, the structure of these schemes is often consistent. Scammers typically initiate contact with victims through unsolicited text messages, WhatsApp, Telegram, or professional networking platforMr.Perpetrators offer flexible remote "jobs" involving simple repetitive tasks such as rating products, boosting listings, reviewing content, or "optimizing" applications. Victims are then directed to fake task platforms that mimic legitimate compensation structures and display fabricated earnings. After a brief period of small, sometimes real payout, victims are told they must deposit their own funds, increasingly in the form of cryptocurrency, to unlock higher-tier commissions, or cover purported processing fees. As victims deposit ever-larger amounts to protect the balances they appear to have already earned, they are trapped in an escalating cycle of further demands. When victims ultimately attempt to withdraw, they are met with manufactured obstacles designed to extract still more money. These come in the form of fake verification fees, "negative balance" charges, or tax or compliance holds. Ultimately, when victims can no longer pay or begin to question the scheme, the perpetrators abruptly sever communications and abscond with the victims' assets.

3.     Tens of thousands of Americans have lost their savings to task and employment scams, with losses accelerating dramatically in recent years.

The Federal Trade Commission's Consumer Sentinel Network received approximately 20,000 reports of gamified task scams in the first six months of 2024, a roughly fourfold increase over the roughly 5,000 reports received in all of 2023, and tallied more than $220 million in reported losses to job scams during that same six-month period, including approximately $41 million specifically tied to cryptocurrency payments. The Federal Bureau of Investigation's Internet Crime Complaint Center ("IC3") likewise recorded more than 20,000 employment-scam complaints in its 2024 Annual Report, with reported losses exceeding $264 million, and the FBI has separately issued public-service alerts identifying work-from-home task-platform schemes that require cryptocurrency deposits as a fast-growing vector for consumer fraud. Cryptocurrency-denominated fraud of all kinds accounted for over $9.3 billion in losses reported to IC3 in 2024 alone. These figures reflect only reported complaints and are widely believed to dramatically understate the true scale and reach of the scam typology.

4.      This action arises from an archetypical task-scam employment fraud. The Defendants recruited Mr. Zucchero into a purported remote-work opportunity, directed Mr. Zucchero to a fraudulent task platform that displayed fabricated earnings, induced Mr. Zucchero to deposit escalating amounts of cryptocurrency under the guise of increased earning potential, and then blocked withdrawals while demanding still further deposits. In so doing, the Defendants stole $371,358 of the victim's assets. The stolen funds

have now been dissipated through foreign-controlled cryptocurrency wallets and exchange accounts.

5.      This action and coordination with law enforcement are the victim's only hopes for recovery. This suit seeks the return of the assets stolen by the Defendants and additional relief described below.

## II.    Parties

6.      Plaintiff Michael Zucchero is an individual residing in Denver, Colorado. Plaintiff brings this action to recover assets stolen through the fraudulent scheme described herein.

7.      Bizango is a fraudulent remote-work task platform operating as a general partnership. The platform was presented to Mr. Zucchero as a legitimate online compensation service through which Mr. Zucchero's would earn commissions by completing simple repetitive tasks, but was in fact a fictitious or controlled environment designed to display fabricated earnings, induce escalating cryptocurrency deposits, and block withdrawals. Its headquarters and situs of organization lie outside the United States, although the precise locations from which it carries out its operations are presently unknown.

8.      Selena Romano is an individual of foreign citizenship who acted as the recruiter in the scheme. Romano initiated unsolicited contact with Mr. Zucchero through an unsolicited text message, offered Mr. Zucchero a purported remote-work opportunity, and directed Mr. Zucchero onto the

fraudulent task platform operated by Bizango. Romano's present whereabouts are unknown.

9.     The OKX Off-Ramp Defendant is a recipient of the assets misappropriated from the victim in this case. The OKX Off-Ramp Defendant is a foreign individual or entity whose present whereabouts and citizenship are unknown.

10.     The Binance Off-Ramp Defendant is a recipient of the assets misappropriated from the victim in this case. The Binance Off-Ramp Defendant is a foreign individual or entity whose present whereabouts and citizenship are unknown.

### III.   Jurisdiction & Venue

11.     This is an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Accordingly, this Court has federal-question jurisdiction.

12.     This Court has personal jurisdiction over Defendants pursuant to RICO and consistent with the Due Process Clause of the Fifth Amendment. RICO authorizes nationwide service of process, and where, as here, a federal statute provides for such service, the relevant constitutional inquiry is whether Defendants have sufficient aggregate contacts with the United States as a whole, not with any single state.

13.     The Defendants purposefully directed their conduct at the United States by targeting U.S. residents, inducing the transfer of funds from U.S.-based accounts, utilizing U.S.-based cryptocurrency infrastructure and

internet services, and causing substantial harm within the United States. Exercising personal jurisdiction over Defendants therefore comports with traditional notions of fair play and substantial justice, and is reasonable under the Supreme Court's flexible due-process framework applicable to federal statutes providing for nationwide service of process.

14.    In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). This action arises under federal law, Defendants are not subject to the personal jurisdiction of any single state's courts, and Defendants have sufficient contacts with the United States as a whole to satisfy due process. Accordingly, the exercise of jurisdiction under Rule 4(k)(2) is proper.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(3), which provides that a foreign defendant may be sued in any judicial district.

### IV.    Background

16.    Employment and task scams are a recognized and extensively documented form of organized cyber-enabled fraud. This section describes the defining characteristics of these schemes. Such scams rely on fraudulent remote-work pretexts and engineered, recognizable mechanics. They are often associated with organized crime and transnational operations, and depend on cryptocurrency and centralized financial infrastructure to receive, convert, and conceal stolen funds, as established by law-enforcement agencies, regulators, and public reporting.

## A.  Definition & Recognition of Employment and Task Scams

17.  At their core, employment and task scams are a form of cyber-enabled fraud in which perpetrators recruit victims into a purported remote-work opportunity and then, through a carefully engineered sequence of small simulated payouts and escalating deposit demands, induce victims to transfer their own funds to the perpetrators. Unlike investment-fraud typologies that depend on a cultivated romantic or confidence relationship and the illusion of passive investment profits, task scams exploit the victim's willingness to work for income: the fraud is structured as a job, with assigned tasks, an apparent employer, an apparent compensation schedule, and an apparent platform on which wages accrue.

18.  The conduct follows a consistent structural arc: unsolicited recruitment contact, onboarding and trust-building through small real-looking payouts, and escalating deposit demands to unlock further compensation. The behavior culminates in blocked withdrawals and, in many cases, additional threats or extortion. Contact is typically initiated through unsolicited text messages, WhatsApp, Telegram, Facebook Messenger, or professional networking platforms, and uses generic pitches such as "product boosting," "app optimization," "data labeling," or "online ratings work."

19.  Law-enforcement agencies and regulators in the United States have formally recognized employment and task scams as a distinct and prevalent fraud typology. The Federal Trade Commission's Consumer

Sentinel Network has issued a dedicated Data Spotlight documenting the sharp rise of gamified task scams and their reliance on cryptocurrency. The Federal Bureau of Investigation, through its Internet Crime Complaint Center ("IC3"), separately tracks an Employment scam category among the highest-loss fraud categories, and has issued a public-service announcement specifically addressing "work-from-home" scams in which victims are recruited onto fake task platforms and then required to make cryptocurrency deposits to continue earning.

20.    Academic and industry reporting likewise treats task scams as a discrete and repeatable fraud model. These schemes are described as built on engagement-economy psychology. Standardized scripts exploit specific behavioral pressure points (sunk-cost bias once fake earnings have accumulated, reciprocity bias from initial real payouts, and loss-aversion when accrued balances appear to be at risk), with the result that otherwise careful consumers repeatedly comply with deposit instructions that, in the absence of the fabricated platform mechanics, they would recognize as obvious fraud.

21.    As described in these law-enforcement and public sources, employment and task scams are best understood as a system of fraud rather than a series of isolated incidents. The defining feature of the scheme is the deliberate engineering of a payout-then-deposit trap: the perpetrators simulate legitimate work with accrued earnings, then gate withdrawals

behind successive deposit requirements designed to extract the maximum possible amount from the victim before the fraud is abandoned.

### B.    Organizational and Industrial Nature of Task-Scam Operations

22.    Task scams are often operated by organized groups that employ standardized processes, division of labor, and centralized coordination to target large numbers of victims simultaneously. Law-enforcement investigations and public reporting consistently describe these schemes as enterprise-level operations. They may be run out of large-scale call-center and "scam compound" facilities in Southeast Asia. The lack of enforcment in these jurisdictions enables sustained fraud across borders and over extended periods of time.

23.    These operations typically involve distinct functional roles. Some participants are responsible for initial outreach. These workers send mass unsolicited messages using scripted recruitment pitches. Others, often referred to as "mentors," "supervisors," or "team leaders," take over once a victim responds and run the onboarding, training, and day-to-day task-assignment scripts that build the appearance of a real job. Still others manage the technical infrastructure of the fake task platforms, including web and mobile applications that display fabricated earnings, simulated commissions, and withdrawal interfaces. Additional participants oversee the receipt, movement, and aggregation of victim funds through cryptocurrency wallets, exchange accounts, and payment-processor relationships. This

specialization allows the enterprise to scale efficiently while insulating the scheme's organizers and money-laundering specialists from direct contact with victims.

24.    Task-scam organizations rely heavily on pre-written scripts, training materials, and operational playbooks. Investigative reporting and consumer-protection research have documented the use of standardized recruitment templates, onboarding instructions, escalation cues, and objection-handling scripts tailored to different victim profiles, including variations based on employment status, geography, and perceived financial capacity. The resulting uniformity across otherwise unrelated cases—near-identical pitches, identical "charge up" mechanics, identical withdrawal-block excuses, and identical cryptocurrency deposit instructions, is itself evidence of organized operation rather than opportunistic conduct.

25.    The organizational structure of task-scam schemes also enables continuity. When a particular platform domain, messaging handle, recruitment phone number, or wallet address is exposed, operators are able to rapidly substitute new infrastructure while maintaining the same underlying methods and personnel. This adaptability allows the enterprise to persist even as individual components are identified or disrupted, and contributes to the repeatable and ongoing nature of the fraud.

26.    Law-enforcement and regulatory authorities have further reported that many task-scam operations are transnational in scope, with

participants, infrastructure, and financial flows spanning multiple countries. These schemes frequently exploit global messaging services, cross-border financial systems, and cryptocurrency networks to reach victims in the United States while operating largely outside the victims' physical jurisdictions.

### C.    Reliance on Cryptocurrency and Online Infrastructure

27.    Task scams depend heavily on cryptocurrency and internet-based infrastructure to facilitate both the execution and concealment of fraudulent activity. Cryptocurrency is the typically-preferred payment rail through which victim deposits are extracted. It enables perpetrators to receive and move large sums rapidly, across borders, and with a degree of pseudonymity that is difficult for individual victims to penetrate without legal process. Cryptocurrency also removes the traditional friction of wire reversals, chargebacks, and bank holds that would otherwise allow victims and financial institutions to intervene after a recruiter-directed deposit.

28.    In a typical task-scam operation, victims are directed to transfer cryptocurrency to specific wallet addresses designated by the recruiter or by instructions embedded in the fraudulent task platform. These wallets are presented to victims as platform deposit addresses, "wallet activation" addresses, or commission-processing addresses, even though the platform itself is fictitious or controlled entirely by the fraud enterprise. The appearance of accruing legitimate earnings and of real-time balance updates

on the task platform is generated through manipulated interfaces rather than any genuine commercial activity.

29.    To manage volume and liquidity, task-scam operations commonly route victim funds through centralized cryptocurrency exchanges, custodial services, and other third-party infrastructure providers. These intermediaries play a functional role in the fraud ecosystem by enabling the aggregation, storage, conversion, and onward transfer of misappropriated assets. The use of such services allows perpetrators to consolidate funds from many victims and to move assets through successive layers of accounts en route to fiat liquidation or conversion to other assets.

30.    The design of these schemes prioritizes speed and dissipation. Once funds are deposited by victims, perpetrators often move the assets quickly through multiple wallets, mixers, or cross-chain bridges in an effort to frustrate tracing and recovery. This rapid movement increases the risk that stolen assets will be irretrievably lost unless prompt investigative and legal measures are taken.

31.    Because task scams depend on identifiable cryptocurrency transactions and the use of centralized infrastructure at key stages, blockchain analysis and legal process directed to service providers are critical tools for identifying the flow of stolen assets and preserving them for potential recovery. Courts are therefore routinely called upon to evaluate requests for

asset preservation and expedited discovery in cases involving this form of fraud.

### V.   Application of Employment-Scam Framework to Victim's Experience

32.   The events giving rise to this action reflect the same sequence of conduct, methods, and structural features that characterize employment and task scams as described above. The following factual allegations illustrate how those features manifested in Mr. Zucchero's experience.

### A.   Recruitment Pitch

33.   On November 5, 2025, Mr. Zucchero received an unsolicited text message from an individual identifying herself as Selena Romano, who claimed to be a representative of Bizango, a purported employment platform. Romano stated that Bizango was seeking part-time workers to perform online product optimization tasks. Romano described the opportunity as a remote position, requiring flexible hours and offering attractive compensation in exchange for completing simple click-through assignments to boost product visibility on e-commerce sites. Romano claimed that Bizango paid workers a commission per completed task, with increasing compensation tiers: $500 for the first five days, rising to $1,500 after fifteen days and $3,500 after thirty days. Romano emphasized the work's part-time nature and the ability for Mr. Zucchero to earn substantial income from home.

### B.  Onboarding & Trust-Building

34.  Following this initial outreach, Romano provided Mr. Zucchero with instructions on registering for the Bizango platform. Romano personally guided Mr. Zucchero through the creation of a task account and conducted an orientation session where she demonstrated how to navigate the workflow. Romano assigned herself as Mr. Zucchero's supervisor and remained in regular contact, providing ongoing support and encouragement. Mr. Zucchero was required to make a small initial cryptocurrency deposit to activate his account and begin work. After this, he was granted access to the Bizango website, where he completed several demonstration tasks. On completing these tasks, the platform credited Mr. Zucchero's account with simulated earnings, and a portion of the accrued commissions, totaling a few thousand dollars, was made available for withdrawal through the platform. The timely appearance of these earnings and the accessible interface of the website gave the process an aura of legitimacy and fostered Mr. Zucchero's trust in the platform. Romano reinforced this trust by explaining the commission structure in detail, reiterating the rising pay schedule linked to continued participation and higher account levels.

### C.  Deposit Demands & Escalation

35.  As Mr. Zucchero continued to engage with Bizango's system, Romano introduced a series of escalating deposit requirements tied to account "VIP" upgrades and task groupings referred to as "combination orders." Romano explained that participation in higher-value commission tiers

necessitated upgrading to higher VIP levels, each of which required a corresponding increase in deposited cryptocurrency. Whenever Mr. Zucchero attempted to complete particularly valuable task combinations, the platform indicated that his account balance was insufficient to process the aggregate value of these combination orders, prompting additional deposit requests. Romano justified each deposit as a prerequisite to unlock increased earning potential or to cover the notional value disparity of certain orders. In reliance on these representations, Mr. Zucchero deposited incrementally larger amounts, eventually totaling over $200,000 across several weeks. This pattern continued until, upon completing a sequence of combination orders in early February 2026, Mr. Zucchero was instructed to deposit over $100,000 to fulfill his account obligations. All deposits were made at Romano's direction and under the guise of advancing to progressively higher earning brackets.

### D.      Withdrawal Block & Extortion

36.      Upon attempting to withdraw his accumulated balance from the Bizango user portal in February 2026, Mr. Zucchero encountered a series of withdrawal restrictions. Platform support staff informed him that, in order to approve the transaction, he was required to complete additional verification steps. When Mr. Zucchero failed to execute these verification steps in the prescribed manner, he was advised by both Romano and platform support that he must "prove" h isavailable funds by depositing $150,000 into his cryptocurrency wallet. The purported rationale was that Bizango could only process withdrawals to wallets funded with an amount equal to a

specified percentage of the platform balance. After contesting the necessity and scale of this requirement, Mr. Zucchero was told the deposit obligation would be reduced to $120,000. Under continued pressure and assurances that his withdrawal was imminent, Mr. Zucchero added approximately $95,000 to his cryptocurrency wallet in February 2026. Without his authorization, those funds were promptly withdrawn from his wallet through a smart contract integration controlled by Bizango. At that point, having lost control of the deposited assets and facing contradictory and escalating demands, Mr. Zucchero recognized that the entire arrangement was fraudulent and immediately sought legal counsel.

### E.      Representative Misrepresentations Made to Mr. Zucchero

37.     The individuals orchestrating the scheme, including Romano, misrepresented nearly every material aspect of the opportunity, beginning with their own identities and affiliations. Romano falsely claimed to be an authorized representative of Bizango, a legitimate and established company, and stated that Bizango was engaged in lawful product optimization services with active positions for remote workers.

38.     Romano further misrepresented the nature of the work by describing it as genuine product boosting and e-commerce optimization, accompanied by a detailed commission and compensation structure. In reality, no such legitimate employment existed, and the promised earnings

were merely fabricated numbers displayed on the fraudulent Bizango platform.

39.     Additionally, the platform and Romano misrepresented Mr. Zucchero's supposed account performance, fabricating earnings statements and task completion records in order to induce further deposits. The mechanism for earning payouts, including the concept of tiered account levels, combination orders, and corresponding commission brackets, was wholly fictitious and designed solely to solicit increasing cryptocurrency transfers.

40.     Finally, the defendants repeatedly assured Mr. Zucchero that his deposited funds and accrued earnings would be readily available for withdrawal, subject only to trivial verification procedures. At each stage where Mr. Zucchero attempted to access his funds, the scheme introduced new, insurmountable barriers, none of which were disclosed at the outset or supported by any contractual basis. These assurances were made with the intent to lure Mr. Zucchero into making further deposits and forestall detection of the fraud.

### VI.     Tracing & Movement of Misappropriated Assets

41.     This section describes the movement of Mr. Zucchero's misappropriated cryptocurrency assets from the initial transfers induced by the fraud through subsequent transactions on the blockchain, including transfers through wallets and centralized cryptocurrency services associated with the Defendants.

### A.    Transfers of Cryptocurrency from Mr. Zucchero

42.    In reliance on the misrepresentations described above, Mr. Zucchero transferred cryptocurrency to wallet addresses designated by the perpetrators and presented as associated with the purported investment platform. These transfers were made over a defined period and consisted of multiple transactions of increasing value.

43.    Each transfer was initiated by Mr. Zucchero from cryptocurrency wallets under Mr. Zucchero's control and was directed to specific destination wallet addresses provided by the perpetrators. The Victim understood these transfers to constitute deposits into a legitimate investment account. In reality, the transfers resulted in the permanent relinquishment of control over the cryptocurrency to the fraud enterprise.

### B.    Blockchain Tracing of the Stolen Assets

44.    Blockchain analysis performed after discovery of the fraud identified the movement of Mr. Zucchero's cryptocurrency from the initial destination wallets through a series of subsequent transactions. Because cryptocurrency transactions are recorded on public blockchains, the flow of funds could be traced despite the perpetrators' use of pseudonymous wallet addresses.

45.    The tracing analysis demonstrated that the destination wallets provided to Mr. Zucchero were not independent investment accounts but were instead aggregation wallets used to receive funds from multiple victims. From

these wallets, the cryptocurrency was rapidly transferred to additional wallets in patterns consistent with laundering and concealment.

46. The movement of funds followed a repeatable structure commonly observed in task-based employment schemes. Specifically, blockchain tracing revealed the following.

47. Funds deposited by Mr. Zucchero pursuant to the defendants' instructions were transmitted to a series of blockchain wallet addresses and subsequently routed through major cryptocurrency exchanges including OKX, Binance, HTX, and Bitget. Tracing analysis revealed that the vast majority of Mr. Zucchero's deposits, totaling approximately $371,358, were aggregated and transferred in large increments to wallets associated with these exchanges. The funds were swiftly moved through intermediary addresses designed to obscure their origin and facilitate further disposition. The movement of assets was consistent with patterns of illicit activity tied to similar online task frauds, and the tracing process established a clear nexus between Mr. Zucchero's lost funds and wallet clusters controlled by the defendants or their associates.

### C. Transfers through Centralized Exchanges & Custodial Services

48. Tracing analysis further revealed that a substantial portion of Mr. Zucchero's cryptocurrency was transferred from intermediary wallets to accounts held at centralized cryptocurrency exchanges and custodial service

providers. These services enable the storage, conversion, and withdrawal of cryptocurrency and serve as critical exit points for fraud proceeds.

49.    The transfers into these services were identifiable through on-chain transaction data and corresponded to known deposit addresses associated with specific platforms. Once deposited, the assets were commingled with other funds and became subject to the internal account controls of the custodial providers.

50.    The use of centralized exchanges and custodial services allowed the Defendants to convert, transfer, or withdraw stolen assets in a manner that would be difficult or impossible for individual victims to prevent without timely judicial intervention.

### D.    Dissipation Risk and Need for Prompt Asset Preservation

51.    The tracing analysis showed that the stolen assets were moved rapidly after receipt and continued to be transferred through multiple wallets and platforms. This pattern reflects a deliberate effort by the Defendants to dissipate and conceal the proceeds of fraud and substantially increases the risk that the assets will be irretrievably lost.

52.    Because cryptocurrency transactions are irreversible and because custodial platforms may permit rapid withdrawal or conversion absent legal restraint, delays in investigation or court-ordered relief materially reduce the likelihood of recovery.

53.    Courts addressing task-based employment schemes and similar cryptocurrency fraud schemes have recognized that early asset tracing, preservation orders, and expedited discovery are essential to prevent irreparable harm to victims and to preserve the possibility of restitution.

### E.    Connection Between Traced Assets and Defendants

54.    The wallets, accounts, and infrastructure through which Mr. Zucchero's assets were transferred are associated with the Defendants and/or entities that provided services integral to the operation of the fraud scheme. These services enabled the receipt, aggregation, storage, and movement of stolen assets and were necessary to the scheme's success.

55.    The tracing evidence establishes a direct causal link between the Defendants' fraudulent conduct, Mr. Zucchero's cryptocurrency transfers, and the subsequent movement of those assets through identifiable wallets and service providers. This chain of transactions confirms that Mr. Zucchero's losses were the foreseeable and intended result of the scheme.

### VII.    Defendants' Roles & Participation in the Fraudulent Scheme

56.    The fraudulent scheme described above depended on the coordinated participation of multiple Defendants, each of whom performed a distinct and essential role. As alleged herein, each Defendant knowingly engaged in conduct that furthered the scheme and was necessary to its success.

### A. Selena Romano — The Recruiter and Lead Operator

57. Selena Romano acted as the primary recruiter and lead operator in the scheme. Romano initiated unsolicited contact with Mr. Zucchero through an unsolicited text message and offered Mr. Zucchero a purported remote-work opportunity.

58. Using a fabricated identity and false employment credentials, Romano walked Mr. Zucchero through onboarding on the fraudulent task platform operated by Bizango, including account setup, task assignments, and the compensation schedule. Romano controlled the pacing of the scheme, including when the initial small withdrawals were permitted and when additional deposits were demanded.

59. Romano directed Mr. Zucchero to deposit cryptocurrency into specific wallet addresses under the guise of unlocking opportunities for further compensation, and conveyed false assurances regarding Mr. Zucchero's ability to withdraw the accrued earnings.

60. This conduct is consistent with the role of recruiters in employment and task-scam schemes as documented in consumer-protection and law-enforcement reporting, which describe recruiters as frontline operators responsible for inducing victim deposits while remaining insulated from the receipt and laundering of funds.

## B.    Bizango — Operator of the Fraudulent Task Platform

61.    Bizango operated, controlled, or materially supported the purported remote-work task platform used in the scheme. This platform was presented to Mr. Zucchero as a legitimate online compensation service but was, in reality, a fictitious or controlled environment designed to simulate task assignments, display fabricated commissions, and implement the deposit mechanic that extracted Mr. Zucchero's funds.

62.    The platform operated by Bizango served as the central mechanism by which the scheme created the illusion of legitimacy. Its task dashboards, account balances, withdrawal interfaces, and commission histories were designed to induce reliance, reinforce the perception of accruing earnings, and justify successive deposit demands.

63.    Bizango did not in fact operate any legitimate marketplace, advertising business, or commercial client whose work could have generated Mr. Zucchero's displayed earnings. Instead, the platform's reported activity was illusory and functioned to reinforce the misrepresentations made by Selena Romano, including false claims regarding earned balances, withdrawal eligibility, and the purpose of required deposits.

64.    The use of a controlled or fictitious task platform in this manner is a defining feature of employment and task-scam schemes and is repeatedly documented in consumer-protection and law-enforcement reporting. Bizango's platform performed precisely this role here.

## C.    The Off-Ramp Defendants — Money Laundering and Exchange Off-Ramp Account(s)

65.    The OKX Off-Ramp Defendant agreed to participate in the conspiracy by agreeing with the other members of the Enterprise that they would route Mr. Zucchero's assets through multiple addresses on the blockchain and ultimately pool them at off-ramp exchange accounts controlled by the OKX Off-Ramp Defendant. This conduct was undertaken for the purpose of facilitating the laundering and concealment of Mr. Zucchero's stolen cryptocurrency. Blockchain tracing analysis determined that approximately $163,465 of Mr. Zucchero's assets were transferred to accounts controlled by the OKX Off-Ramp Defendant. By knowingly receiving, holding, converting, and transferring these fraud proceeds, the OKX Off-Ramp Defendant directly facilitated the monetization and dissipation of Mr. Zucchero's losses.

66.    The Binance Off-Ramp Defendant agreed to participate in the conspiracy by agreeing with the other members of the Enterprise that they would route Mr. Zucchero's assets through multiple addresses on the blockchain and ultimately pool them at off-ramp exchange accounts controlled by the Binance Off-Ramp Defendant. This conduct was undertaken for the purpose of facilitating the laundering and concealment of Mr. Zucchero's stolen cryptocurrency. Blockchain tracing analysis determined that approximately $3,194 of Mr. Zucchero's assets were transferred to accounts controlled by the Binance Off-Ramp Defendant. By knowingly

receiving, holding, converting, and transferring these fraud proceeds, the Binance Off-Ramp Defendant directly facilitated the monetization and dissipation of Mr. Zucchero's losses.

### D.    Coordinated and Interdependent Conduct

67.    The Defendants' conduct was coordinated and interdependent. Each Defendant performed a specialized function that complemented the others and advanced the common objective of defrauding Mr. Zucchero.

68.    Selena Romano recruited the victim through an unsolicited remote-work pitch and onboarded the victim onto the fraudulent Bizango task platform, which displayed fabricated earnings and extracted escalating cryptocurrency deposits from the victim under the guise of "charge-up," tier-unlock, and fee requirements, and the Off-Ramp Defendants received, converted, and off-ramped the stolen cryptocurrency. Each Defendant played a distinct but complementary role in the fraudulent scheme, and their coordinated conduct caused the injuries alleged herein.

69.    These actions reflect a deliberate division of labor consistent with organized task-based employment schemes and demonstrate knowing participation in a common plan that directly caused Mr. Zucchero's losses. Defendants did not merely receive cryptocurrency incidentally or passively. Each Defendant knowingly agreed to perform a specific function within the scheme and undertook affirmative acts in furtherance of that role. These acts included placing accounts or wallet infrastructure at the disposal of the

scheme, exercising discretion over the receipt and movement of funds, and repeatedly performing the same functions as part of an ongoing operation.

## VIII.  Evidence of Multiple Victims and Ongoing Fraudulent Activity

70.     The fraudulent conduct described above was not limited to Mr. Zucchero or to a single, isolated incident. Blockchain tracing and analysis of transactions associated with Defendants' wallet addresses and exchange accounts reveal that Defendants received cryptocurrency from numerous additional sources consistent with victim transfers in similar fraud schemes.

71.     Backward tracing of transactions flowing into wallet addresses and exchange accounts controlled by the Defendants shows repeated deposits originating from multiple U.S.-based cryptocurrency exchanges and other sources associated with individual retail accounts, rather than a single origin or legitimate business activity.

72.     These incoming transactions occurred over an extended period exceeding one year, with substantial amounts transferred at regular intervals. The volume, timing, and structure of these transactions are inconsistent with ordinary investment activity and are consistent with the aggregation of proceeds from multiple fraud victims.

73.     The traced transactions include deposits traceable to accounts at U.S.-based exchanges commonly used by individual consumers, indicating that the scheme affected multiple victims located in the United States, not solely Mr. Zucchero in this action.

74. The repeated receipt of funds from different sources, across different exchanges, and over a prolonged period demonstrates that Defendants' conduct was part of a continuing course of fraudulent activity, rather than a single completed act. The same wallet addresses, exchange accounts, and laundering pathways were reused to process victim funds.

75. Moreover, tracing shows that Defendants' infrastructure remained active after Mr. Zucchero's losses were incurred, and continued to receive and move cryptocurrency in a manner consistent with ongoing fraudulent activity. This pattern indicates a threat of continued criminal conduct absent judicial intervention.

76. The existence of multiple victims, repeated transactions, and the reuse of the same laundering and pooling mechanisms confirms that Defendants' scheme was designed to operate indefinitely and to extract cryptocurrency from additional victims over time.

## IX. Causes of Action

77. Plaintiff brings the following causes of action against the Defendants. The allegations set out above are incorporated into each of the causes of action that follow as if fully restated therein.

### COUNT ONE
### RACKETEERING IN VIOLATION OF 18 U.S.C. § 1964(C) AGAINST ALL DEFENDANTS

78. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

### A.    The RICO Enterprise

79.    At all relevant times, Defendants Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant were associated with an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

80.    The Enterprise consisted of a group of individuals and entities associated in fact for the common purpose of defrauding victims through task-based employment schemes, extracting cryptocurrency from victims, laundering the proceeds, and consolidating and enjoying the fraud proceeds.

81.    The Enterprise had relationships, longevity, and structure sufficient to permit its members to pursue the Enterprise's purpose. Defendants performed distinct but complementary roles pursuant to an agreed-upon division of labor, including grooming victims, operating a fraudulent employment platform, laundering proceeds through exchange off-ramps, and consolidating assets in pooling addresses.

### B.    Interstate Commerce

82.    At all relevant times, the activities of the Enterprise affected interstate and foreign commerce, including through the use of interstate wire communications, internet-based messaging platforms, cryptocurrency networks, and centralized cryptocurrency exchanges operating in or affecting the United States.

### C.    Conduct or Participation in the Enterprise's Affairs

83.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3).

84.    Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

85.    Selena Romano conducted the Enterprise's affairs by initiating and maintaining communications with Mr. Zucchero, making fraudulent misrepresentations, cultivating trust through fabricated identities, and inducing Mr. Zucchero to transfer cryptocurrency pursuant to the Enterprise's scheme.

86.    Bizango conducted the Enterprise's affairs by operating and controlling the fraudulent employment platform that simulated employment activity, displayed fabricated profits, and reinforced the misrepresentations used to induce additional cryptocurrency transfers. Bizango knowingly provided the technical infrastructure necessary to sustain the illusion of legitimate employment.

87.    The Off-Ramp Defendants conducted the Enterprise's affairs by knowingly and affirmatively agreeing to serve as a laundering and off-ramp conduit for fraud proceeds. The Off-Ramp Defendants agreed with other members of the Enterprise to receive stolen cryptocurrency into centralized

exchange accounts and to convert, withdraw, and transfer those assets in furtherance of the scheme.

88. The Off-Ramp Defendants roles were not passive or incidental. By agreeing to place exchange accounts at the disposal of the Enterprise, knowingly receiving large volumes of fraud proceeds, and executing conversions and withdrawals consistent with laundering activity, the Off-Ramp Defendants exercised discretion, judgment, and control that furthered the Enterprise's objectives and enabled the laundering and monetization of stolen assets.

### D. Pattern of Racketeering Activity

89. Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts of wire fraud in violation of 18 U.S.C. § 1343.

90. These predicate acts included, without limitation, the transmission of fraudulent representations via interstate wire communications, the use of interstate wires to direct victims to transfer cryptocurrency, the operation of a fraudulent trading platform through internet-based systems, and the use of interstate wires to move, convert, launder, and consolidate fraud proceeds.

91. The racketeering acts were related, as they shared common purposes, victims, methods, and participants, and they amounted to or posed a threat of continued criminal activity.

92.    The racketeering acts constituted closed-ended continuity, as they occurred over a substantial period of time, and open-ended continuity, as the scheme was inherently capable of repetition and posed a continuing threat to additional victims.

### E.    Proximate Cause and Damages

93.    Defendants' violations of 18 U.S.C. § 1962(c) were the direct and proximate cause of Plaintiff's injuries, including the loss of cryptocurrency assets transferred in reliance on Defendants' fraudulent conduct.

94.    As a result of Defendants' RICO violations, Plaintiff suffered concrete financial losses, including but not limited to the value of misappropriated cryptocurrency, lost wages, and related damages.

### F.    Vicarious and Joint Liability

95.    Each Defendant is jointly and severally liable for the acts of the other Defendants committed in furtherance of the Enterprise's affairs.

96.    Defendants are also liable under principles of vicarious liability, aiding and abetting, and respondeat superior, as applicable.

### G.    Statute of Limitations Tolling

97.    Defendants concealed the existence of the Enterprise and the fraudulent nature of their conduct through fabricated platforms, false identities, and deliberate obfuscation of asset flows, thereby tolling the statute of limitations under principles of fraudulent concealment.

**H.     Relief**

98.     Plaintiff seeks all relief available under 18 U.S.C. § 1964, including treble damages, costs, attorneys' fees, and appropriate equitable relief.

## COUNT TWO
### RACKETEERING CONSPIRACY - 18 U.S.C. § 1964(D)
### AGAINST ALL DEFENDANTS

99.     Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

100.    Defendants Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant knowingly agreed and conspired to conduct and participate, directly and indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

101.    Each Defendant knowingly agreed that a member of the conspiracy would commit at least two acts of racketeering activity constituting wire fraud, money laundering, or related offenses, and each Defendant agreed to perform a specific role in furtherance of the Enterprise's unlawful objectives.

102.    The conspiracy was formed for the common purpose of defrauding victims through task based employment schemes, extracting cryptocurrency from victims through fraudulent means, laundering and off-ramping the proceeds, and consolidating and enjoying the fraud proceeds.

103. In furtherance of the conspiracy, Selena Romano agreed to initiate and maintain deceptive communications with victims, to make material misrepresentations, and to induce victims to transfer cryptocurrency pursuant to the scheme.

104. In furtherance of the conspiracy, Bizango agreed to operate and control a fraudulent employment platform designed to simulate legitimate activity, display fabricated wages, and reinforce the misrepresentations used to induce additional transfers.

105. In furtherance of the conspiracy, the Off-Ramp Defendants agreed to provide exchange accounts under their control for the purpose of receiving, converting, withdrawing, and transferring the proceeds of fraud, with knowledge that such accounts would be used to launder cryptocurrency derived from victim losses.

106. Each Defendant knew the essential nature of the plan and knowingly agreed to facilitate the scheme by performing acts that were necessary or advantageous to the Enterprise's success, even if each Defendant did not personally commit every racketeering act.

107. The conspiracy contemplated and resulted in the commission of multiple overt acts, including the use of interstate wire communications, the operation of fraudulent online infrastructure, the transfer of cryptocurrency through blockchain networks, and the laundering and consolidation of fraud proceeds.

108. Plaintiff was injured in Plaintiff's business or property by reason of the Defendants' agreement to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity, entitling Plaintiff to relief under 18 U.S.C. § 1964.

### COUNT THREE
### CONVERSION – TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

109. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

110. At all relevant times, Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant knowingly participated in a common plan and scheme to defraud Mr. Zucchero through a task based employment scam.

111. In furtherance of the scheme, Selena Romano made material misrepresentations and omissions to Mr. Zucchero, including false statements regarding Selena Romano's identity, experience, and intentions; the legitimacy of the purported employment platform operated by Bizango; the existence of real work and wages; and Mr. Zucchero's ability to withdraw funds.

112. These misrepresentations were false when made and were known to be false by Selena Romano at the time they were made. They were communicated with the intent to induce Mr. Zucchero to rely on them and to transfer cryptocurrency pursuant to the scheme.

113.  Bizango knowingly participated in and furthered the fraud by operating and controlling a fraudulent employment platform designed to simulate legitimate employment, display fabricated account balances and wages, and reinforce the misrepresentations communicated to Mr. Zucchero. Bizango knew that the platform was being used to deceive victims and to induce cryptocurrency transfers.

114.  The Off-Ramp Defendants knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. They knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

115.  Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud. Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

116.  Mr. Zucchero reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

117. As a direct and proximate result of Defendants' fraudulent conduct, Mr. Zucchero suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

### COUNT FOUR
### FRAUD – TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

118. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

119. At all relevant times, Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant knowingly participated in a common plan and scheme to defraud Mr. Zucchero through a task based employment scam.

120. In furtherance of the scheme, Selena Romano made material misrepresentations and omissions to Mr. Zucchero, including false statements regarding Selena Romano's identity, experience, and intentions; the legitimacy of the purported employment platform operated by Bizango; the existence of real employment and wages; and Mr. Zucchero's ability to withdraw funds.

121. These misrepresentations were false when made and were known to be false by Selena Romano at the time they were made. They were communicated with the intent to induce Mr. Zucchero to rely on them and to transfer cryptocurrency pursuant to the scheme.

122.   Bizango knowingly participated in and furthered the fraud by operating and controlling a fraudulent employment platform designed to simulate legitimate employment, display fabricated account balances and wages, and reinforce the misrepresentations communicated to Mr. Zucchero. Bizango knew that the platform was being used to deceive victims and to induce cryptocurrency transfers.

123.   The Off-Ramp Defendants knowingly participated in and furthered the fraud by agreeing to receive, convert, withdraw, and transfer cryptocurrency derived from the scheme through centralized exchange accounts under their control. The Off-Ramp Defendants knew that the assets received through these accounts were the proceeds of fraud and that the accounts were being used to launder victim funds.

124.   Each Defendant knew of the fraudulent plan and agreed to facilitate it, and each Defendant committed acts in furtherance of the fraud. Accordingly, Defendants are liable for fraud under theories of direct liability, conspiracy to defraud, and aiding and abetting fraud.

125.   The Victim reasonably and justifiably relied on the misrepresentations and omissions described above in transferring cryptocurrency and in making additional transfers in response to Defendants' demands.

126. As a direct and proximate result of Defendants' fraudulent conduct, Mr. Zucchero suffered substantial damages, including the loss of cryptocurrency assets and related financial harm.

## COUNT FIVE
## UNJUST ENRICHMENT/RESTITUTION – TEXAS COMMON LAW AGAINST ALL DEFENDANTS

127. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

128. Defendants Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant each received benefits at the expense of Mr. Zucchero, including cryptocurrency assets and proceeds thereof that were misappropriated through fraud and deception.

129. Defendants knowingly accepted, retained, used, or controlled these benefits, either directly or indirectly, as part of the coordinated scheme described herein.

130. Defendants' receipt and retention of Mr. Zucchero's cryptocurrency was unjust and inequitable because the assets were obtained through wrongful conduct, without lawful consideration, and in violation of Mr. Zucchero's rights.

131. Equity and good conscience require restitution of all benefits unjustly obtained by Defendants, including the return of misappropriated cryptocurrency and any proceeds derived therefrom.

132.   Defendants hold such assets in constructive trust for the benefit of Mr. Zucchero and must disgorge all unjust enrichment obtained as a result of their conduct.

### COUNT SIX
### CIVIL CONSPIRACY - TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

133.   Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

134.   Defendants Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant knowingly agreed and conspired with one another to commit unlawful acts, including fraud, conversion, and related wrongful conduct, or to commit lawful acts by unlawful means.

135.   Each Defendant knew of the essential nature and scope of the conspiratorial plan and agreed, expressly or tacitly, to participate in and further the scheme by performing a specific role within a coordinated division of labor.

136.   In furtherance of the conspiracy, Defendants committed overt acts, including but not limited to:

   a. Making material misrepresentations to induce cryptocurrency transfers;

   b. Operating fraudulent investment infrastructure;

    c. Receiving, laundering, off-ramping, pooling, and retaining fraud proceeds;

    d. Concealing the source and movement of misappropriated assets.

137. Defendants' acts were interdependent and mutually reinforcing, and each Defendant benefitted from the conspiracy by receiving or controlling proceeds derived from the unlawful conduct.

138. As a direct and proximate result of Defendants' conspiratorial conduct, Mr. Zucchero suffered substantial damages, including the loss of cryptocurrency assets.

139. Each Defendant is jointly and severally liable for all damages caused by the acts of any co-conspirator committed in furtherance of the conspiracy.

## COUNT SEVEN
## MONEY HAD & RECEIVED – TEXAS COMMON LAW
### AGAINST ALL DEFENDANTS

140. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

141. The Off-Ramp Defendants received money and/or cryptocurrency assets that belonged to Mr. Zucchero and were wrongfully obtained through fraud and conversion.

142. The assets received by the Off-Ramp Defendants were traceable to Mr. Zucchero's transfers and were accepted with knowledge, or willful blindness, that the assets constituted proceeds of unlawful activity.

143. The Off-Ramp Defendants retained, controlled, or used these assets for their own benefit or for the benefit of the fraudulent scheme.

144. In equity and good conscience, the Defendants should not be permitted to retain Mr. Zucchero's property, and restitution is required.

145. Plaintiff is entitled to recover from Defendants the full amount of money and cryptocurrency had and received, together with interest and other equitable relief.

## X.      Relief Sought

146. Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and jointly and severally against Selena Romano, Bizango, the OKX Off-Ramp Defendant, and the Binance Off-Ramp Defendant and grant the following relief:

### A.      Injunctive and Equitable Relief

147. A temporary restraining order, preliminary injunction, and permanent injunction enjoining Defendants, their agents, employees, co-conspirators, and all persons acting in concert with them from directly or indirectly:

> a. Engaging in employment schemes or similar fraudulent conduct;

b. Soliciting or inducing cryptocurrency transfers through misrepresentation or deception;

c. Transferring, dissipating, concealing, converting, or otherwise disposing of assets traceable to the scheme.

d. An order freezing all cryptocurrency, fiat currency, accounts, wallets, exchange accounts, and other assets owned by, controlled by, or traceable to Defendants that are derived from or connected to the fraudulent scheme.

e. An order authorizing expedited discovery, including but not limited to subpoenas directed to cryptocurrency exchanges, custodial service providers, financial institutions, and other third parties, for the purpose of identifying, tracing, and preserving assets and identifying additional participants in the scheme.

f. An order requiring Defendants to provide a full accounting of all cryptocurrency, fiat currency, wallets, exchange accounts, and other assets received, transferred, converted, or controlled in connection with the scheme.

g. An order imposing a constructive trust over all cryptocurrency, fiat currency, exchange accounts, wallets, and other assets that are traceable to the fraudulent

scheme, including assets held by Defendants or by third parties for Defendants' benefit.

h. An order directing any cryptocurrency exchange, custodial service, or financial institution holding assets subject to the constructive trust to preserve such assets and, upon further order of the Court, to transfer or release such assets to Mr. Zucchero.

### B.    RICO Remedies (18 U.S.C. § 1964)

148.   Treble damages pursuant to 18 U.S.C. § 1964(c) for injuries sustained by Plaintiff as a result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d).

149.   An order disgorging all ill-gotten gains obtained by Defendants as a result of the racketeering activity.

150.   An order imposing a constructive trust over all assets traceable to the racketeering enterprise.

151.   An award of costs, expenses, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### C.    Compensatory and Restitutionary Relief

152.   Compensatory damages in an amount to be proven at trial for all losses suffered by Plaintiff, including but not limited to the value of misappropriated cryptocurrency and related financial harm.

153.   Restitution of all cryptocurrency and other assets wrongfully taken from Plaintiff.

154. Pre-judgment and post-judgment interest as permitted by law.

### D. Declaratory Relief

155. A declaration that Defendants' conduct violated federal RICO statutes and common law governing fraud and conversion.

156. A declaration that Plaintiff is entitled to recover assets traceable to the fraudulent scheme from Defendants and any third parties holding such assets for Defendants' benefit.

157. A declaration that Defendants possess no lawful ownership interest in assets traceable to the scheme and that such assets are held in equity for Mr. Zucchero.

### E. Additional Relief

158. An order appointing a receiver or special master, if necessary, to identify, marshal, manage, and preserve assets subject to this action.

159. Such other and further relief as the Court deems just and proper.

### XI. Jury Demand

160. Plaintiff demands a trial by jury on all claims so triable.

- 45 -

Dated:  May 26, 2026

Respectfully submitted,

CYBERJUSTICE LAW GROUP


Marshal J. Hoda, Esq.
Tx. Bar No. 2411009
Alexander Crous, Esq.
Tx. Bar No. 24136488
3120 Southwest Fwy
Ste. 101 PMB 51811
Houston, TX 77098
o. (832) 838-0036
marshal@cyberjustice.law
alex@cyberjustice.law

*Attorneys for Plaintiff*